MIRINA CORPORATION, Plaintiff,

v.

MARINA BIOTECH, Defendant.

Case No. C10–1322RAJ.

United States District Court,
W.D. Washington,
at Seattle.

March 7, 2011.

Kevin S. Costanza, Nathaniel Eli Durrance, Seed Intellectual Property Law Group PLLC, Seattle, WA, for Plaintiff.

David W.C. Chen, DWC Law Firm, Tiffany Hallen Scott, Brian G. Bodine, Lane Powell PC, Seattle, WA, for Defendant.

ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on Plaintiff's motion for preliminary injunction (Dkt. # 33). The court has considered the parties' briefing and supporting evidence, and has heard from the parties at oral argument. For the reasons explained below, the court DENIES the motion (Dkt. # 33).

Because this order "grant[s] or den[ies] an interlocutory injunction," the court must make findings and fact and conclusions of law. Fed.R.Civ.P. 52(a)(2). The court includes its findings and conclusions in this order, which serves as a memorandum of the court's decision. Fed.R.Civ.P. 52(a)(1) (permitting findings and conclusions within "an opinion or a memorandum of decision"); see also FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1109 (9th Cir.1982) (noting that explicit factual findings are unnecessary).

## II. BACKGROUND

In July 2010, Defendant Marina Biotech ("Marina") changed its business name from MDRNA, Inc. to Marina Biotech. Marina Biotech has offices in Seattle and Boston, and provides services focused on the development and commercialization of therapeutic products based on RNA interference. See French Decl. (Dkt. # 54) ¶ 3. MDRNA, Inc. became a publicly traded company in June 2008, and trades on NASDAQ under the "MRNA" ticker symbol. See French Decl. ¶ 4.

Plaintiff Mirina Corporation ("Mirina") is a biotech company based in the greater Seattle area that, since August 2008, has promoted microRNA-based therapeutic research and drug development. See Hoekstra Decl. (Dkt. # 43) ¶ 3. Mirina has submitted evidence that its name is pronounced like "marina" both inside and outside the company. See 2d Atwood Decl. (Dkt. # 35) ¶ 4, Le Decl. (Dkt. # 46) ¶ 4, Gray Decl. (Dkt. # 39) ¶ 3, Harris Decl. (Dkt. # 42) ¶ 3, Schubert Decl. (Dkt. # 51) ¶ 3, Hall Decl. (Dkt. # 41) ¶ 5, Hubbert Decl. (Dkt. # 45) ¶ 5, Hoekstra Decl. (Dkt. # 43) ¶ 4, Frey Decl. (Dkt. # 38) ¶ 4, Hooper Decl. (Dkt. # 44) ¶ 4, Dow Decl. (Dkt. # 36) ¶ 4, Fleming Decl. (Dkt. # 37) ¶ 4.

Five days after Defendant changed its name to Marina Biotech, Plaintiff filed a trademark application for the "Mirina" mark. See Complaint, Ex. A. Plaintiff filed this suit against Defendant, alleging that Defendant's use of marks and trade name constitutes trademark infringement, trade name infringement, false designation of origin and unfair competition, and a violation of Washington's Consumer Protection Act ("WCPA"). Mirina moved for a preliminary injunction, asking the court to restrain Defendant from all acts of infringement, including using the "Marina" or "Marina Biotech" marks.

## III. ANALYSIS

### A. Legal Standards.[1]

The Ninth Circuit has retooled its long-enduring standard for preliminary injunctive relief in the wake of *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The former Ninth Circuit standard included a sliding scale on which a moving party could compensate for a lesser showing of harm by showing a correspondingly greater chance of success on the merits, and vice versa:

> Under the "traditional" criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*NRDC v. Winter,* 518 F.3d 658, 677 (9th Cir.2008) (citation omitted). In *Winter,* the Supreme Court rejected the Ninth Circuit standard to the extent that it made injunctive relief available on a showing of a mere possibility of irreparable harm. 129 S.Ct. at 375. Some subsequent Ninth Circuit panels used broad language about the effect of *Winter* on the alternative standard for injunctive relief. *See, e.g., Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1126–27 (9th Cir.2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter*], they are no longer controlling, or even viable.") (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir.2009)).

The panel in *Alliance for the Wild Rockies ("Alliance") v. Cottrell* took a narrow view of *Winter.* 632 F.3d 1127 (9th Cir. 2011), *withdrawing op. at* 613 F.3d 960 (9th Cir.2010) *and amended at* 622 F.3d 1045 (9th Cir.2010). After reviewing the post-*Winter* landscape in the Ninth Circuit and in other circuits with sliding-scale injunction standards, *id.* at 1130–35, the *Alliance* panel "conclude[d] that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter.*" *Id.* at 1134. The "serious questions version of the sliding scale test" requires the movant to demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* (quoting *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir.2008) (en banc)). The *Alliance* panel explained that the serious questions test survives, so long as the plaintiff "make[s] a showing on all four prongs" of the *Winter* test. *Id.*

■ This court accordingly applies the following test for a preliminary injunction,

---

**1.** The court notes that the Plaintiff's briefing was unhelpful regarding the appropriate standards to be applied on a motion for injunctive relief. The Plaintiff did not cite *Winter* or post-*Winter* authority until after the Defendant pointed out Plaintiff's failure to do so in its Opposition. *See* Def.'s Opp'n at 7. The Defendant had previously pointed out Plaintiff's failure to address current case authority (see Def.'s Opp'n (Dkt. # 12) at 6), and the court is mystified why the Plaintiff did not address the recent changes to standards for injunctive relief in its opening brief. Though the Plaintiff attempts to argue that *Winter* and its progeny do not apply in trademark cases (see Pltf.'s Reply at 2), Plaintiff cited no authority for that proposition and other district courts have applied *Winter* in trademark cases. *See, e.g., Internet Specialties West, Inc. v. Milon–DiGiorgio Enters., Inc.,* 559 F.3d 985, 993–94 (9th Cir.2009).

consistent with *Winter* and *Alliance*. The court may issue a preliminary injunction where a party establishes (1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction. *Id.* at 1137–38, *Winter*, 129 S.Ct. at 374. A party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor. *Alliance*, 632 F.3d at 1137–38.

## B. The Merits of the Plaintiff's Case.

■ The court will turn to consider the first *Winter* prong: the likelihood that the Plaintiff will succeed on the merits of its trademark infringement claim.[2] A plaintiff alleging trademark infringement must show that the alleged infringer (1) used in commerce "(2) a word, false designation of origin, false or misleading description, or representation of fact," that "(3) is likely to cause confusion or misrepresents the characteristics of [its] or another [entity]'s goods or services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007).

■ To determine whether a likelihood of confusion exists for a reasonable consumer in the marketplace, the Ninth Circuit suggests consideration of the following eight factors: (1) strength of the mark, (2) proximity of the mark, (3) similarity of the mark, (4) evidence of actual confusion, (5) marketing channels, (6) type of goods and degree of care by purchaser, (7) the defendant's intent, and (8) the likelihood of expansion of the product line. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979). The *Sleekcraft* list of factors is neither exhaustive nor exclusive. *See E. &*

*J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992). A claimant can establish a likelihood of confusion without satisfying all of the *Sleekcraft* factors. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998).

■ The Plaintiff contends that the proximity, similarity, and marketing channels factors weigh heavily in Plaintiff's favor, and that the remaining *Sleekcraft* factors also support the existence of a likelihood of confusion. Thus, the court will consider all the *Sleekcraft* factors in numerical order to evaluate whether Plaintiff has shown that confusion is likely.

### 1. The Strength of Plaintiff's Mark.

Plaintiff contends its mark is strong because "Mirina" is a coined and/or arbitrary term (i.e., it is not a word found in a dictionary); Defendant argues that "Mirina" is a suggestive (and therefore weak) mark because it is a play on "miRNA," which is a commonly used abbreviation for micro-RNA.

■ Plaintiff's arbitrariness argument is undercut by its own briefing: Plaintiff admits that Mirina's spelling "suggests an association with mirco-RNA (sic)." Pltf.'s Reply (Dkt. # 55) at 1. *See also* Scott Decl. (Dkt. # 53), Ex. C at 21:7–18. A suggestive mark is stronger than a generic mark, but not as strong as an arbitrary mark. *See, e.g., E. & J. Gallo*, 967 F.2d at 1291. That other businesses (such as Mirna Therapeutics and Miragen Therapeutics) in the micro-RNA industry use an "mir" prefix further belies the arbitrariness of Plaintiff's mark. *See Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 605 (9th Cir.1987) (holding that because "nutri-" was a common prefix in the food and

---

**2.** Though the Plaintiff's complaint lists several claims, the Plaintiff's preliminary injunction briefing focuses on the trademark infringement claim. *See* Pltf.'s Mot. at 11:26–27.

health products community, the district court did not err in finding "Nutri/System" to be a weak mark). Thus, Plaintiff's mark is moderately weak and this factor does not favor Plaintiff.

## 2. Proximity of the Marks.

Plaintiff contends that this factor weighs heavily in Plaintiff's favor because Plaintiff and Defendant provide "competing, similar, and complementary services (RNA based drug development)[.]" Pltf.'s Mot. at 13. Defendant argues that that assertion is not supported by evidence. *See* Def.'s Opp'n at 22. To whatever degree a Mirina board member opined that Plaintiff and Defendant offer similar and competitive services, Defendant argues that the value of that opinion is severely undercut by that board member's deposition testimony, wherein he admits that Plaintiff's "services" are still in the development stage and that his understanding of Defendant's plans to directly compete with Plaintiff is based on an unidentified press release. *See* Scott Decl., Ex. C at 52–53, 71; *see also* Durrance Decl. (Dkt. # 56), Ex. C at 68:22–69:24 (Mirina board member explains that though his declaration states that Defendant offers its services to the same investors and customers as Plaintiff, that statement is based on an assumption and not on personal knowledge).

The court agrees with Defendant that the record does not establish a close proximity of the marks. While it is undisputed that both Plaintiff and Defendant are interested in developing products related to RNA, Defendant's work to date has focused on products based on RNA interference, while Plaintiff intends to develop miRNA drugs. Particularly where Plaintiff has not presented evidence that it has actually developed any product or provided any service, it is difficult to determine exactly how closely related Plaintiff's services would be to Defendant's services. Thus, this factor does not favor Plaintiff.

## 3. Similarity of the Marks.

Though Defendant points to some evidence of differences in pronunciation and the distinctions between the logos of each business (see Def.'s Opp'n at 11), Plaintiff's briefing focuses on the fact that "Mirina" and "Marina" "differ by one letter, and that one letter difference does not change their pronunciation[.]" Pltf.'s Reply at 4. Thus, Plaintiff's infringement argument is based on the similarity of sound and spelling between "Mirina" and "Marina," but not on the appearance of logos or meanings of the marks.

While there is some evidence of potential variation in pronunciation of "Mirina" (as either "marina" or "meerina") (see Scott Decl., Ex. C at 19–20), the Plaintiff has submitted statements from multiple declarants who state that "Mirina" and "Marina" are phonetically indistinct. *See* Atwood Decl. (Dkt. # 34) ¶ 2, Gray Decl. (Dkt. # 39) ¶ 3, Hall Decl. (Dkt. # 41) ¶ 5; Harris Decl. (Dkt. # 42) ¶ 3; Hoekstra Decl. (Dkt. # 43) ¶ 4; Hooper Decl. (Dkt. # 44) ¶ 4; Hubbert Decl. (Dkt. # 45) ¶ 5; Le Decl. (Dkt. # 46) ¶ 4. Thus, to the extent that Plaintiff argues that the "sound" of Plaintiff's and Defendant's marks and their spellings are similar, the court agrees.

With regard to visual similarity of Plaintiff's and Defendant's marks in the form of logos: the Plaintiff has not devoted any briefing to a comparison of Plaintiff's logo with Defendant's logo, nor submitted any evidence about any perceived similarity between Plaintiff's blue, green, and white logo with a capital "M" and Defendant's logo depicting a circular cellular construct. Neither has Plaintiff submitted any evidence of a similarity of meaning between Plaintiff's and Defendant's marks: Plaintiff has submitted evidence that because "Mirina" can be pronounced like "marina," a hearer would understand "Mirina" to

evoke images of water and boating, but this evocation is undercut by the mark's intended connection with micro-RNA. Thus, while the court finds that the marks are similar as to sound, this finding of similarity does not extend to sight (in the sense of logo) or meaning.

#### 4. Evidence of Actual Confusion.

Plaintiff has submitted evidence that, at least on a handful of occasions in casual conversation, there has been some confusion as to whether a speaker was referring to "Mirina" or "Marina." *See* Frey Decl. (Dkt. # 38) ¶ 3; Gray Decl. (Dkt. # 39) ¶ 6; Harris Decl. (Dkt. # 42) ¶ 4; Hooper Decl. (Dkt. # 44) ¶ 3. Plaintiff has also submitted evidence that out of the seven or eight face-to-face conversations a Mirina affiliate had with potential investors at a conference, six of those potential investors initially confused Mirina for Marina Biotech. *See* Durrance Decl. (Dkt. # 56), Ex. 1 at 73. Likewise, a Mirina board member spoke to a potential investor who at first believed that the board member was referring to Defendant, but the board member recognized the confusion and clarified. *See* Le Decl. (Dkt. # 46) ¶ 7; 2d Le Decl. (Dkt. # 47) ¶ 4. That same board member spoke with another person who was also at first confused Plaintiff and Defendant, but then the confusion was clarified. *See* 2d Le Decl. ¶ 6. These instances of confusion total approximately ten or fifteen conversations, and Plaintiff has not provided any evidence that any confusion has led directly to an adverse funding decision. *See* Durrance Decl. (Dkt. # 56), Ex. 2 at 104:14–105:1; 111:4–112:1 (Mirina affiliate's deposition testimony that he does not know of any specific adverse funding decision due to confusion), Ex. 3 at 47:3–11 (same).

As Defendant notes, all of the actual confusion described by Plaintiff occurred during conversations, and all of the confusion was cleared up after the confusion became apparent. *See* Def.'s Opp'n at 16. Defendant argues that these instances are not "actual confusion" in the trademark sense because "they describe instances that do not involve marketing channels" or other circumstances where the usage of the mark is controlled by the trademark owner. *Id.* at 17–18.

■ Generally, courts consider evidence of actual confusion to be "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. It is true that many of the instances of confusion described by Plaintiff occurred in casual conversation at a memorial service, an environment completely unrelated to marketing by either the Plaintiff or Defendant. But the other instances occurred in conversations between Plaintiff's affiliates and potential investors, though the confusion was cleared up relatively quickly. Plaintiff has not provided any contextual evidence showing, for example, that confusion occurs in a majority of all marketing conversations, or what percentage of marketing contacts are initiated via interpersonal communication without the use of any printed or graphical marketing materials. Nonetheless, the court finds that the instances of actual confusion demonstrated by Plaintiff's potential investors do weigh in Plaintiff's favor.

#### 5. Marketing Channels.

Plaintiff contends that its marketing channels—industry meetings, conferences, and online forums—are the same as Defendant's. Plaintiff underscores this argument with the evidence of investor confusion at a recent investor forum, arguing that investor familiarity with both Plaintiff and Defendant shows that "the two companies court the same partners and investors." Pltf.'s Reply at 8. The Defendant does not dispute this argument in its briefing.

Given that the undisputed evidence in the record shows that Plaintiff and Defendant rely upon at least some of the same marketing channels, the court finds that this factor weighs in Plaintiff's favor, though notes that the record is not particularly deep as to how the Plaintiff and Defendant actually market themselves in those channels. Though Plaintiff's evidence of marketing includes a lot of interpersonal communications, there is also evidence in the record that Plaintiff and Defendant also market themselves using printed or graphic materials (see, e.g., French Decl. ¶¶ 12–13 (describing a typical investor pitch for Defendant, which includes sharing printed materials and occasionally a PowerPoint presentation); Scott Decl., Ex. C at 102–103), which would thereby minimize confusion based on the phonetic similarities between Plaintiff and Defendant.

### 6. Degree of Care.

The parties agree that their customers (investors) are highly sophisticated. *Compare* Def.'s Opp'n at 18 *with* Pltf.'s Reply at 8–9. But, while the Defendant focuses on the high degree of care that must support an investment decision in this field, the Plaintiff focuses on the brief, informal conversations that can result in a decision *not to invest* (without disputing that a decision *to invest* would be supported by a high degree of care). *Compare* Def.'s Opp'n at 18–19 *with* Pltf.'s Reply at 8–9. According to Plaintiff, Defendant's use of the "Marina" name has caused potential *Mirina* investors to reject initial networking conversations because they believe they are being approached on behalf of Defendant instead of Plaintiff. Plaintiff claims that this confusion "supports issu-

ance of a preliminary injunction as 'initial interest confusion.'" Pltf.'s Mot. at 19.

■ "Initial interest confusion" occurs when a defendant's use of confusing trademark initially attracts the consumer to the defendant, and this confusion may still be an infringement even if no sale is consummated as a result of the confusion. *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1062–63 (9th Cir.1999); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1405 (9th Cir.1997); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257–58 (2d Cir.1987).[3] "Initial interest confusion" has been likened to a "bait and switch" scheme, in that "potential customers are lured away from a trademark holder's product to a competitor's product through the deceptive use of the holder's mark." *Designer Skin, LLC v. S & L Vitamins, Inc.,* 560 F.Supp.2d 811, 818 (D.Ariz.2008). But in this case, Plaintiff does not argue that Defendant lures its customers away: it argues instead that Plaintiff has a harder time making business contacts because the contacts believe the Plaintiff is the Defendant. Thus, this case is distinguishable from cases where the court has applied an "initial interest confusion" theory.

Nonetheless, the court finds that the Plaintiff has shown that the investor community does—to at least some degree—incorporate previous perceptions (and misperceptions) to influence their willingness to consider investment. *See, e.g.,* Le Decl. ¶ 7 (describing a potential investor's initial belief that he had already considered investing in Plaintiff, but later realized he was thinking of Defendant). Some of Plaintiff's other evidence, however, describes the typical investment procedure,

---

**3.** The court notes that in most of these cases, the products at issue were consumer goods. A purchaser of consumer goods undergoes a very different decisionmaking process than an investor in drug research and development.

A "bait and switch"-style scheme would be unlikely to be successful in the investment context, given the protracted process by which an investor decides whether to invest.

which would minimize or eliminate confusion because the Plaintiff initiates investment discussions. *See* Durrance Decl. (Dkt. # 56), Ex. 3 at 15:2–7, 79:2–80:9 (describing the typical investment procedure). Thus, because sophisticated investors make a series of inquiries before making an ultimate investment decision, and confusion could diminish their willingness to continue inquiring, the court finds that this factor weighs only slightly in Plaintiff's favor. *See Morningside Group Ltd. v. Morningside Capital Group*, 182 F.3d 133 (2d Cir.1999) (finding that though investors are a sophisticated group, they may nonetheless "be confused about the affiliation between two similarly named companies and might very well alter their behavior based on that confusion").

### 7. Defendant's Intent.

The Defendant was aware of Plaintiff's existence at the time Defendant changed its name from MDRNA, Inc. to Marina Biotech. *See* French Decl. (Dkt. # 54) ¶ 15 (describing a brief conversation between Plaintiff's board member and Defendant's chief executive officer, before Defendant's name change). Though Plaintiff's board member expressed concern about potential confusion, Defendant's chief executive officer told him that he believed that potential customers or partners of either Defendant or Plaintiff would not be confused between the two businesses. *See* French Decl. ¶ 7. Though Plaintiff has not presented any evidence of malice on the part of Defendant or any intentional act of deception on the part of the Defendant, the court finds that this factor nonetheless favors Plaintiff. *See Sleekcraft*, 599 F.2d at 354.

### 8. Likelihood of Expansion.

The parties do not dispute that both parties intend to expand their product offerings, and there is some indication in the record that Defendant intends to expand into Plaintiff's field of miRNA therapeutics. *See, e.g.,* French Decl., Ex. A at 28 (apparently depicting Defendant's plans to produce microRNA therapeutics by the end of 2011). Thus, this favor weighs in favor of Plaintiff. *See Sleekcraft*, 599 F.2d at 354.

The court finds that, on balance, a consideration of the *Sleekcraft* factors weigh somewhat in Plaintiff's favor, though not overwhelmingly so. The record before the court emphasizes phonetic similarity between the two business names and how that similarity leads to confusion in interpersonal conversations, but the court is left with some doubt as to whether this confusion is as widespread, invasive, or detrimental as Plaintiff's selective evidence may make it appear, particularly where the evidence currently before the court shows that Plaintiff's mark is relatively weak. Nonetheless, on that record, the court finds that the Plaintiff has raised serious questions about the likelihood of confusion.

### C. Irreparable Harm.

Plaintiff argues that it can be presumed that if it does not obtain an injunction, Plaintiff will lose investment opportunities due to confusion and Plaintiff will lose control of its mark. Defendant questions whether such a presumption is still available post-*Winter*, given that the Supreme Court requires that a plaintiff seeking preliminary injunctive relief demonstrate that "irreparable injury is likely in the absence of an injunction." 129 S.Ct. at 375.

Though some district courts in the Ninth Circuit have found that irreparable harm may no longer be presumed upon a finding that a likelihood of trademark infringement has been shown, other courts have displayed significant doubt about that approach. *See Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1166–67 (C.D.Cal.2009) (surveying the Ninth Circuit landscape on the issue). Whereas this

court has applied the presumption in a reverse confusion case (see *Masters Software, Inc. v. Discovery Commc'ns, Inc.,* 725 F.Supp.2d 1294 (W.D.Wash.2010)), the court finds that such application is not warranted here because there are not the same proof problems in a traditional case. Plaintiff has entirely failed to submit any proof beyond speculation as to its reputation or goodwill in the relevant market, which leaves the court with no basis upon which to evaluate any intangible harm. Furthermore, lost sales or business opportunities cannot constitute an *irreparable* harm, because (assuming they exist in this case) even if they were difficult to calculate, they would still constitute monetary, measurable damages. *See Aurora World,* 719 F.Supp.2d at 1169 (quoting *Reebok Intern. Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1558 (Fed.Cir.1994)). Therefore, the court finds that Plaintiff has failed to establish that it would suffer an irreparable injury without an injunction.

## D. The Balance of the Hardships and the Public Interest.

Plaintiff argues that "Defendant will suffer no harm" if the court grants an injunction, because Defendant has used the "Marina Biotech" name for only a matter of months. Pltf.'s Mot. at 23. Defendant disputes that, pointing to the costs of "rebranding, regulatory compliance, and any loss of shareholder value" that would have to be borne by the publicly traded company. Def.'s Opp'n at 23. Furthermore, Defendant points to the lack of evidence presented as to Plaintiff's investment in and marketing of the "Mirina" mark to argue that the balance of hardships favors Defendant. *See, e.g.,* Durrance Decl. (Dkt. # 56), Ex. 2 at 81:11–82:5, 135:4–135:7 (deposition excerpts highlighting lack of specific evidence about Plaintiff's services), Ex. 3 at 29:15–30:3 (deposition excerpt highlighting lack of specific evidence about Plaintiff's use of "Mirina" mark).

▮ The court agrees with Defendant and finds that the balance of hardships do not tip in Plaintiff's favor. There is no evidence in the record from which the court could conclude that Plaintiff would face more serious impact without an injunction than Defendant would face if one were granted, because the record contains no evidence of Plaintiff's reliance upon the "Mirina" mark. Plaintiff is still in the early stages of development as a business (when compared with Defendant), and the court does not have any evidence of reputation or goodwill linked with the "Mirina" name. *See Playmakers, LLC v. ESPN, Inc.,* 297 F.Supp.2d 1277, 1285 (W.D.Wash. 2003) (finding the balance of hardships tipping in favor of defendant where plaintiff "put forth very little in the way of what investments have been made and what hardships may befall" without an injunction).

Finally, to whatever minimal degree the public has an interest in this case, then the public interest would favor Plaintiff to the degree that Plaintiff can prevail on its infringement claim, because "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties West, Inc. v. Milon–DiGiorgio Enters., Inc.,* 559 F.3d 985, 993 n. 5 (9th Cir.2009).

Because the court finds that the Plaintiff has raised only serious questions on the merits of its infringement claim, and has failed to establish irreparable harm or that the balance of hardships tips in its favor, the Plaintiff is not entitled to injunctive relief.

## IV. CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion (Dkt. # 33).